1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10  WARREN DAVID ROSE, JR.,

11              Petitioner,                    No. CIV S-03-1502 LKK JFM P

12        vs.

13  STEVEN MAYBERG, DIRECTOR,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15  _____/

16              Petitioner is civil detainee in state custody proceeding through counsel with an

17  application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his

18  2001 commitment to Atascadero State Hospital under California's Sexually Violent Predator Act

19  (SVPA), Cal. Welf. & Inst. Code § 6600 et seq.  Petitioner claims that (1) the trial court violated

20  his due process rights by failing to apply the principles of res judicata and collateral estoppel; and

21  (2) the trial court violated his due process rights by failing to instruct the jury that it had to find

22  petitioner suffered from a mental condition which rendered him dangerous beyond his control.

23                         PROCEDURAL BACKGROUND

24              1.  On April 2, 1984, petitioner pled guilty and was court-martialed for violent

25  sexual offenses against three eight-year-old girls and sentenced to a determinate term of thirteen

26  years in federal prison.  (CT 35; 62.)  Petitioner was paroled from federal custody in 1990.

1    2.  Petitioner violated the terms of his parole by contacting, hitting, and twice

2  raping his ex-girlfriend and returned to federal prison for five years.  He was released in 1996.

3    3.  On February 13, 1997, petitioner was convicted in state court of committing a

4  lewd and lascivious act upon a child under 14 years of age.  He was sentenced to state prison for

5  three years.

6    4.  On November 2, 1999, the first SVPA petition was denied.  In a trial to the

7  court the trial judge specifically relied on the testimony of Dr. Theodore Donaldson in finding the

8  SVPA petition had not been proven beyond a reasonable doubt.  Although the trial judge

9  acknowledged that the state had

> sufficient evidence that there [was] a substantial risk that
> [petitioner] may reoffend, [the trial judge stated that] on the crucial
> issue of whether beyond a reasonable doubt it [had] been shown
> that it [was] likely that he will engage in sexually violent behavior,
> the Court [was] just simply unable to say that, under the testimony
> that came out here, that Dr. Donaldson's estimate [was]
> unreasonable.

14  (RT (Nov 1999) at 147.)

15  The court denied the petition finding that "[T]he Court does have a reasonable doubt on whether

16  it [was] likely, that is more than 50 percent likely, that [petitioner] might engage in a sexually

17  violent behavior."  (Id.)  After issuing that ruling on November 2, 1999, the trial judge ordered

18  that petitioner be processed for parole or otherwise handled by the Department of Corrections

19  consistent with his ruling that petitioner had not been proved to be a sexually violent predator.

20  (RT (Nov 1999) at 148.)  Petitioner was released on parole.

21    5.  On April 9, 2000, the state held a parole revocation hearing based on two

22  charges:  contact with a minor and giving false information.  The hearing agent found good cause

23  existed for both charges and found petitioner had violated two special conditions of parole.

24  ((Parole Revocation Hearing Tr. at 26.)  Petitioner was assessed four months for each violation

25  and admonished to become very familiar with his parole conditions in the future.  (Id.)

26  /////

6.  On July 26, 2000 the state filed a second SVP petition, and on September 13, 2001 the petition was tried to a jury.  On October 10, 2001, the jury found petitioner was a sexually violent predator likely to reoffend and he was placed in custody under the SVPA two year civil commitment.

7.  On February 28, 2003, the Third District Court of Appeal denied petitioner's appeal from the judgment.

8.  On April 3, 2003, petitioner filed a petition for review in the California Supreme Court.  The petition was denied, en banc, without comment.

9.  On July 14, 2003, petitioner filed the instant action.  On December 1, 2003, petitioner filed an amended petition raising only exhausted claims.

10.  Since petitioner's initial SVPA commitment in 2001, there have been no subsequent commitment trials, although recommitment petitions were filed in 2003 and 2005. (Pet.'s July 5, 2005 Mem. at 2.)  Trial is currently scheduled for August 17, 2005 on the 2003 petition.  (Id.)  A probable cause hearing on the 2005 petition began on June 28, 2005, and is scheduled to resume on July 18, 2005.  (Id.)  Respondent concedes that the current petition to recommit petitioner is traceable to his initial term of confinement.  (Resp.'s June 30, 2005 Supp. Brief at 2.)

## FACTUAL BACKGROUND[1]

In 1982, [petitioner] was 27 years old and serving in the United States Navy in Guam when he committed violent sexual offenses against three eight-year-old girls.  He was court martialed for these offenses and sentenced to approximately seven years in federal prison.  He was paroled from federal custody in 1990.

[Petitioner] violated the terms of his parole by contacting, hitting, and twice raping his ex-girlfriend who had told him she was no longer interested in being involved with him.  He was returned to federal prison for five years and released in 1996.

---

[1]   The following summary is drawn from the February 28, 2003 opinion by the California Court of Appeal, Third Appellate District, in People v. Rose, C039548, at 2-4, appended as Ex. D to Respondent's Answer (hereinafter "Opinion").

Less than a year after [petitioner's] release from prison, he reoffended by committing a lewd act on a seven-year-old girl whom he was babysitting.  He was charged and convicted of violating Penal Code section 288, subdivision (a) and sentenced to three years' imprisonment.

On June 8, 1999, prior to his completion of his three-year sentence, the prosecution filed a petition to have him committed as an SVP, and attached two psychological evaluations prepared by clinical psychologists Drs. Craig Updegrove and Dana E. Putnam.  After a court trial, the petition was found not true.

[Petitioner] completed his term of imprisonment and was released from prison in 2000.  He then promptly violated the terms of his parole by failing to keep a log of his behavior and whereabouts, providing false information to his parole officer, and having contact with minors.  On July 26, 2000, the prosecution filed a second SVP petition, attaching three psychological evaluations, the first evaluation prepared by Dr. Putnam and two new evaluations also prepared by Drs. Putnam and Updegrove.

Drs. Putnam and Updegrove testified at [petitioner's] jury trial and gave similar diagnoses.  They both opined that [petitioner] was predatory within the meaning of the SVPA and that he suffered from a diagnosed mental disorder of pedophilia as defined by the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (DSM-IV-TR)[2] and section 6600.  Dr. Updegrove testified that [petitioner's] disorder affects his emotional and volitional capacity and his impulse control and predisposes him to commit criminal sexual acts, so that he is not able to control himself from acting on his urges.  Both doctors concluded [petitioner] was likely to commit sexually violent predatory acts in the future and that he fit the criteria of an SVP.  Dr. Putnam defined "likely" as greater than 50 percent.  Both doctors estimated that [petitioner's] likelihood of reconviction was 33 percent at five years, 38 percent at 10 years, and 52 percent at 15 years.

The jury found [petitioner] to be a sexually violent predator and the trial court committed him to the custody of the DMH for a period of two years.  (§§ 6604, 6604.1 subd. (a).)

(Opinion at 2-4.)

/////

---

[2]  Pedophilia is defined as recurrent, intense sexual attraction, urges, fantasies, and behaviors involving prepubescent children, which continues for a period of at least six months. (DSM-IV, *supra*, at pp. 571-572.)

PRIOR PROCEEDINGS

I. <u>1999 Court Trial on SVP Petition</u>

In petitioner's first civil commitment trial, the parties waived jury trial.  Three witnesses were called by the state:  Craig Updegrove, Ph.D., Dana Putnam, Ph.D., and petitioner, over his objection.  (CT 137-9; RT (Oct 1999) at 7-86 (Updegrove) & 2-129 (Putnam); RT (Oct 1999) at 93-148 (Rose).  These witnesses provided evidence regarding petitioner's prior 1984 court martial convictions for sex offenses in Guam and a 1996 conviction for touching a young girl.  Although there were differences in the testimony concerning petitioner's conduct during the offenses subject to the 1984 court martial proceedings, there was sufficient evidence to demonstrate petitioner's conduct involved three victims, thus meeting the statutory requirement that petitioner had been convicted of a sexually violent offense against two or more victims.

In his defense, petitioner called Dr. Theodore Donaldson, a clinical psychologist. (RT (Oct 1999) at 149.)

1.  Craig Updegrove, Ph.D.

Dr. Updegrove is a clinical psychologist employed by the California Department of Mental Health to do SVP evaluations.  (RT (Oct 1999) at 7; 8-9; 12.)  Prior to interviewing petitioner, Dr. Updegrove reviewed petitioner's prison file, including his medical files, as well as records of petitioner's prior convictions and the totality of petitioner's criminal history.  (RT (Oct 1999) at 10; 29.)  Dr. Updegrove summarized petitioner's conviction history as explained to him by petitioner and testified that in his opinion petitioner suffered from a condition of pedophilia, described in the Diagnostic and Statistical Manual IV ("DSM IV") of mental disorders as "recurrent and intense sexually arousing, fantasies, urges, behaviors involving prepubescent children."  (<u>Id.</u> (Oct 1999) at 17, 21.)  The DSM IV is the standard reference for mental health diagnosis.  (<u>Id.</u> at 21.)

Dr. Updegrove testified that petitioner's pedophilia had affected his volitional abilities because he had not been able to control his deviant sexual urges, his use of sexual force

5

1  for any substantial period of time, even after having been sanctioned; this indicated to Dr.

2  Updegrove that petitioner was not able to control his impulses.  (Id. (Oct 1999) at 23.)  Dr.

3  Updegrove stated that in his opinion petitioner suffered from the inability to control his impulses

4  as it related to his pedophilia.  (Id. (Oct 1999) at 24.)  He based this opinion on evidence

5  petitioner had engaged in sexual conduct with several young girls while in the Navy and faced

6  severe sanctions from that; when released from custody in 1990 he "became involved in a

7  relationship with an adult female where his sexual urges were deviantly and criminally

8  displayed" (id. at 24); following release from custody in 1996 he was sexually involved with a

9  seven year old girl and told an investigator that he knew the temptation was getting too much and

10  that he needed to stop the behavior and get away from the girl so he wouldn't continue to molest

11  her.  (Id. (Oct 1999) at 24-25.)

12      Dr. Updegrove further testified that he believed petitioner was predisposed to

13  sexual activities with young girls based on his repeated sexual involvement with girls, and stated

14  that "his developmental history of being sexually victimized in a rather severe and profound way

15  when he was young . . . has set the template for that and so that it's a deep and strong part of his

16  experience."  (Id. (Oct 1999) at 25.)

17      Dr. Updegrove opined it was likely petitioner would reoffend based on certain risk

18  factors that research has found to increase a person's risk of sexual reoffense, that petitioner

19  continued to engage in sexual offending despite being caught and sanctioned.  (Id. (Oct 1999) at

20  26-33.)

21      2.  Dana Evan Putnam, Ph.D.

22      Dr. Dana Evan Putnam was a licensed psychologist for just over three years at the

23  time of trial, with a clinical practice in forensic psychology and other areas, and consulted with

24  the Department of Health to conduct evaluations under the Sexually Violent Predator law.  (RT

25  (Nov 1999) at 2.)  Prior to meeting with petitioner, Dr. Putnam reviewed the documents sent to

26  him by the Department of Mental Health concerning petitioner's prior criminal history as well as

those documents available to the Department of Corrections, including petitioner's central and medical files.  (RT (Nov 1999) at 5.)  Dr. Putnam's testimony was materially the same as Dr. Updegrove's in relating petitioner's conviction and sexual offense history and how that resulted in a diagnosis of pedophilia.  (RT (Nov 1999) at 2-20.)

Dr. Putnam also concluded it was likely petitioner would reoffend.  (RT (Nov 1999) at 21-33.)

Dr. Putnam testified he believed that the act of touching the chest of a young girl qualified as "sexually violent behavior" under the law.  (Id. at 58.)  Dr. Putnam admitted this crime did not involve substantial sexual conduct; petitioner touched the child once, she said "no," and petitioner stopped.  (Id. at 58-59.)  Dr. Putnam further admitted that petitioner was not completely unable to control his conduct.  (Id. at 63-64.)

3.  Dr. Theodore Donaldson

Theodore Donaldson, M.D. was a clinical psychologist specializing in forensic psychology.  (RT (Oct 1999) at 149.)  Dr. Donaldson testified primarily about two areas.  First, he disagreed with the Department of Mental Health doctors' diagnosis that petitioner was a pedophile; Dr. Donaldson concluded petitioner was a child molester which he stated is not a mental disorder.  (Id. 155.)  Second, Dr. Donaldson testified about the lack of confidence that exists in the prediction of sex offender recidivism.

a.  Diagnosis of Petitioner

Dr. Donaldson stated that the SVPA's use of the language "diagnosed mental disorder" is not a mental health term but a legal one.  (Id. 153-54.)  Dr. Donaldson referred to this as "Criteria B" and defined it as requiring "that the person is volitionally impaired to the degree they lack the ability to control their behavior."  (Id. 154.)  Dr. Donaldson examined petitioner with respect to Criteria B.  (Id.)  Dr. Donaldson stated that he "got very little information about the events of the crime or . . . about [petitioner's] feelings at the time he committed the crimes.  I don't know how he felt or what was going on in his mind, so I relied almost entirely on the

1   reports." (Id. at 155.) Dr. Donaldson reviewed the W.I.C. 6600 evaluations, Sacramento County

2   Crime Reports, numerous reports regarding sexual assault and parole revocation in 1991, and the

3   U.S. Navy Investigative reports relative to the 1982 offenses. (Id. 154-55.)

4          Dr. Donaldson found particularly useful reports by two psychiatrists in 1983

5   because they evaluated petitioner fairly close in time to the crimes. (Id. at 155.) The referral

6   psychiatrist said that petitioner did not display evidence of psychosis, neuroses or other

7   personality disorder. (Id. 155-56.) Dr. Donaldson opined that it was clear to him that the referral

8   psychiatrists did not see any evidence of mental illness, such as compulsion or psycho

9   psychology, because the psychiatrists did not note it in their records. (Id. at 156.)

10          Dr. Donaldson opined that if petitioner had been volitionally impaired at that time,

11   the psychiatrists would have noted something. (Id. at 156.) For example, they would have

12   diagnosed obsessive compulsive disorder or noted some feelings of guilt or remorse or fear. (Id.)

13   But these doctors made no such notations. (Id.)

14          In evaluating the events in Guam, Dr. Donaldson testified that the event as

15   described by the victims did not indicate petitioner lost control during the incident. (Id. 156.)

16   The victims did not report that petitioner appeared strange or any different from other times. (Id.

17   156.) "He didn't seem to be compelled to the behavior. He engaged in the behavior." (Id.) Dr.

18   Donaldson stated that there was no indication that petitioner felt bad after the incident as if he

19   had lost control and was worried about it; he did not tell the victims he was sorry. (Id. at 156-

20   57.) Dr. Donaldson dismissed petitioner's statement to one of the girls that her mother would

21   kill her if she found out as "a fairly rational kind of comment" intended to frighten the little girl

22   into not telling anyone. (Id. at 157.) Dr. Donaldson analyzed petitioner's behavior as that of

23   someone trying to cover his trail and not get caught rather than demonstrating volitional

24   impairment. (Id.)

25          Dr. Donaldson testified that there were several times when petitioner expressed

26   remorse. (RT (Oct 1999) at 157.) For example, in 1983 he wrote a letter stating he became

1  involved in a situation which he could not control.  (<u>Id.</u>)  But read in context of the whole letter,

2  Dr. Donaldson testified that petitioner was stating he couldn't control the situation, not himself.

3  (<u>Id.</u> 157-58.)  Dr. Donaldson conceded that the letter provided some slight evidence that

4  petitioner didn't intend to do the acts in Guam.  (<u>Id.</u> at 158.)  "One could interpret that . . . he

5  couldn't control himself given the activities of these little girls."  (<u>Id.</u>)

6  However, Dr. Donaldson testified that the Navy investigating report noted that

7  upon completion of the interrogation, petitioner was extremely emotional, distraught and

8  disturbed, and was referred for medical psychiatric evaluation.  (<u>Id.</u> at 158.)  Although this could

9  be viewed as petitioner feeling disturbed over the events of the crime, Dr. Donaldson noted that

10  the psychiatrist who saw petitioner at that time did not note that.  Thus, it was more likely that

11  petitioner was distraught about the fact that his life was over: he lost his family, his career and

12  everything.  (<u>Id.</u> 158.)

13  Dr. Donaldson also addressed Officer Bayles' 1996 report of petitioner's lewd

14  conduct with the young girl.  (<u>Id.</u>)  "Suspect Rose confirmed that he had touched victim doe on

15  the chest as he became tempted to do so and that he knew that he would not be able to overcome

16  his temptations and felt that the situation was going to get out of hand so he exited the

17  residence."  (<u>Id.</u> at 158.)  Dr. Donaldson testified that although this could be interpreted as

18  indicating petitioner was going to lose control so he "wanted to leave and avoid the thing," it was

19  also consistent with petitioner's generally self-serving reports.  (<u>Id.</u> at 159.)  While the record

20  reflected some things that one could interpret as volitional impairment, Dr. Donaldson stated

21  petitioner's reports always seemed to be fairly self-serving and change over time.  (<u>Id.</u> at 159.)

22  Dr. Donaldson opined that petitioner may have learned that in order to control the situation he

23  has to stay away from it, which is what treatment programs for sex offenders teach sex offenders

24  to do.. (<u>Id.</u> at 159.)

25  Dr. Donaldson stated that there has been "a lot of controversy about how one

26  diagnoses . . . pedophilia."  (RT (Oct 1999) at 159-60.).  He stated that many psychiatrists and

psychologists make the diagnosis only on the basis of behavior, and that the behavior has occurred over a period of six months.  (Id. at 160.)  Dr. Donaldson stated that there is really no cure for a true pedophile, doctors only teach them how to avoid relapse.  (Id. at 159.)  Dr. Donaldson stated that petitioner does not present as a true pedophile.  (Id.)

Dr. Donaldson said that a second criterion of a pedophilia diagnosis requires that it cause distress or impairment, and explained it must be due to dysfunction within the individual.  (Id. at 160).  "Being incarcerated is not a dysfunction of the individual."  (Id. at 160.)  Dr. Donaldson testified that the American Psychiatrist Association ("APA") has found there is a "difference between a child molester and a pedophile, and that most child molesters are not pedophiles, and the distinction is that the true pedophile has some true, serious disorder."  (Id. at 160.)  He explained that pedophilia cannot be diagnosed on the basis of child molest behavior.  (Id.)

Insofar as the diagnosis of pedophilia, the DSM IV requires that urges, fantasies and/or behaviors occur over a period of six months or more.  (RT (Oct 1999) at 161.)  Dr. Donaldson explained that the behavior does not have to be continuous, so events occurring years and years apart could fit the definition.  (Id.)  Dr. Donaldson confirmed that petitioner technically fit the time definition, but stated he had difficulty with the second offense where petitioner touched the breast of the seven year old girl.  (Id.)  The doctor explained that there is not much difference between the breasts of a seven year girl or boy, there were no witness comments about that, and petitioner had claimed it was an accident.  (Id.)  Dr. Donaldson opined that if there were some other evidence of a compulsion that petitioner met the Criterion B, he would consider Criterion A after six months.  (Id. at 162.)  However, with respect to Criterion B, the definition of pedophile under the DSM IV, Dr. Donaldson stated that he didn't think petitioner's behavior was due to any dysfunction or psychopathology that petitioner suffered.  (Id. at 162.)

Dr. Donaldson testified that there was no evidence that petitioner had overcome any internal resistance or feelings to engage in the behavior.  (Id. at 162.)  Dr. Donaldson

1   explained that volitional impairment means the person is engaging in behavior he does not want

2   to engage in, which is also true about compulsion.  (Id.)  "That's behavior a person finds

3   distressing, and they don't want to engage in but they do it because they can't stop themselves."

4   (Id.)  Dr. Donaldson found no evidence of either compulsion or volitional impairment in

5   petitioner.  (Id.)

6          Dr. Donaldson stated petitioner did not exhibit neurological damage or a high risk

7   of psychopathy.  (Id. at 164.)  Dr. Donaldson stated that Dr. Updegrove and Dr. Putnam had

8   evaluated petitioner relative to his psychopathy and confirmed that neither of their findings

9   would indicate that psychopathy was a significant factor for petitioner in terms of emotional

10  capacity.  (Id. at 165.)

11         Dr. Donaldson explained that legal cases like Hubbart, infra at 31, and Hendricks,

12  infra at 35, require volitional impairment to that degree that the offender cannot control his

13  behavior.  (Id. at 168-69.)  In terms of petitioner, Dr. Donaldson explained that there was some

14  evidence petitioner was volitionally impaired, but a lot more evidence that he was not.  (Id. at

15  169.)  Dr. Donaldson stated that there was no evidence about petitioner's behavior or attitude

16  prior to the 1982 offense that indicated petitioner did not want to engage in the behavior.  (Id. at

17  170.)  Dr. Donaldson pointed out that the psychiatrist who saw petitioner shortly after the offense

18  noted petitioner had no remorse or guilt.  (Id.)  Dr. Donaldson opined that petitioner's early

19  experience with adult/child sexual relationships started in childhood when he was molested by

20  his mother and stepfather.  (Id.)  Dr. Donaldson stated petitioner had no strong inhibitions against

21  being involved with children, but didn't actively seek out children.  (Id.)  Dr. Donaldson opined

22  that petitioner interpreted provocative behavior by the girls as sexual behavior and responded

23  accordingly.  (Id.)  Dr. Donaldson explained petitioner misinterpreted social cues.  (Id. at 170-

24  71.)

25         Dr. Donaldson further testified that there was no evidence suggesting petitioner

26  was compelled to touch H.W. in 1996.  (Id. at 171.)  Dr. Donaldson's opinion was that the

1  offense was an impulsive act; the child was in a soaking wet tee shirt.  (Id.)  Dr. Donaldson stated

2  that the incident with H.W. resulted from petitioner's poor impulse control rather than volitional

3  impairment.  (Id.)

4          Dr. Donaldson opined that petitioner is not predisposed to commit a sexually

5  violent offense as defined by statute.  (RT (Oct 1999) at 172.)  Petitioner would need to be

6  predisposed to perform the act prior to the act, requiring some psychopathology of the individual,

7  and Dr. Donaldson found no indication of psychopathology of petitioner.  (Id. at 172.)  Although

8  petitioner's background would cause one to expect some aberration in sexual adjustment,

9  petitioner did not evidence strong feelings associated with his early sexual experience, probably

10  because he didn't know what sex was at that time.  (Id. at 173.)  Dr. Donaldson opined that

11  petitioner would have to have strong feelings associated with his early sexual experience to have

12  psychopathology.  (Id. at 173.)

13          Dr. Donaldson found no evidence petitioner was fixated on young girls.  (Id. at

14  173.)  Dr. Donaldson explained that the girls in the Guam incident were left with petitioner for

15  babysitting.  (Id. at 173.)  Petitioner did not lure the girls to his home as child molesters often do.

16  (Id.)

17          Dr. Donaldson noted that the pornography noted in the Guam incident was

18  significant because it was adult pornography, not related to children.  (Id. at 174.)  Petitioner told

19  Dr. Donaldson that he always had a real interest in pornography and that while he was in Guam

20  he would go to topless bars and nude girlie places and buy pornographic magazines.  (Id. at 174.)

21  This interest in adult women supported Dr. Donaldson's conclusion that petitioner was not a

22  pedophile.  (Id.)

23          On cross-examination, Dr. Donaldson confirmed that the DSM IV definition of

24  pedophilia does not include a definition of compelled behavior.  (Id. at 190.)  Dr. Donaldson

25  confirmed his opinion that petitioner did not meet the first criteria of pedophilia.  (Id.)  He would

26  concede the six month time period, but did not feel petitioner met the "intense" factor as intense

1  was interpreted by the APA – so intense that it was compelled behavior.  (Id. at 191.)

2          Dr. Donaldson further explained his understanding of how gaps in time affected

3  his evaluation of petitioner's distress and feelings of remorse after the offenses.  (Id. at 192-93.)

4  He confirmed his belief that distress experienced at the time of the offense would have been

5  more applicable to a definition of pedophilia than distress voiced many years later after he had

6  learned more about it.  (Id. at 193.)  Dr. Donaldson added that consistency and/or a pattern of

7  statements over a significant period of time would have been more probative.  (Id. at 195.)

8          Dr. Donaldson confirmed that the conclusion of mental illness had nothing to do

9  with guilt or innocence.  (Id. at 196.)

10         Dr. Donaldson confirmed that the evidence in support of volitional impairment

11  was petitioner's 1993 statement in a letter saying he was out of control, the report where the

12  investigating officer described petitioner being very remorseful and distressed and the 1996

13  statement where he wrote to the victim stating he could not control himself.  (Id. at 196-97.)  Dr.

14  Donaldson said that if the behavior occurred well in the past he would put more stock in reports

15  made closer to the time of the event, and that statements by the patient contemporaneous with the

16  behavior were better than third party observations.  (Id. at 197.)  Dr. Donaldson confirmed that

17  this evidence was not clear; it was not well-stated and no one questioned petitioner in any detail

18  about what he meant.  (Id. at 198.)

19         Dr. Donaldson opined that the evidence was unclear whether petitioner was

20  distraught about the offenses themselves or about the investigative processes and the impact it

21  had on his own life, i.e. loss of family, career and friends.  (Id. at 199-200.)  Dr. Donaldson

22  confirmed it was difficult to get reliable information because petitioner could not remember

23  many details surrounding the offenses.  (Id. at 201.)  Petitioner expressed anger about his current

24  situation and the law, but did not offer any spontaneous feelings with regard to his feelings at the

25  time of the crime.  (Id. at 202.)  Because of the ambiguity of the evidence, Dr. Donaldson opined

26  it was better to refer back to the statement petitioner made voluntarily, closer to the time of the

1  offense.  (Id. at 202.)

2  　　　　Dr. Donaldson recounted the four pieces of evidence that he believed contradicted

3  volitional impairment.  (Id. at 202.)  First, the victims did not report petitioner acting in a willful

4  manner, which Dr. Donaldson confirmed was not expected to be found.  (Id. at 203.)  Second, the

5  referring military psychiatrists did not diagnose mental illness or psychopathy, and added

6  comments that petitioner was fully aware of his behavior and expressed no remorse.  (Id. at 203.)

7  Third, petitioner did not molest twelve year old Crystal in the 1990's.  (Id. at 206.)  The fourth

8  piece of evidence was Dr. Donaldson's opinion that petitioner was not volitionally impaired.  (Id.

9  at 207.)  Dr. Donaldson confirmed he did not find the evidence against volitional impairment of

10  more compelling weight than the statements of petitioner.  (Id. at 209.)  He clarified that his

11  object was not to find evidence that petitioner was volitionally intact, but to find reliable

12  evidence that petitioner was volitionally impaired.  (Id.)  Dr. Donaldson confirmed there was

13  evidence on both sides of the issue of volitional impairment; he did not conclude there was

14  credible evidence that petitioner was volitionally impaired at the time of the offense.  (Id. at 209-

15  10.)  Dr. Donaldson reinforced his definition of pedophiles as compelled to the behavior as

16  distinguished from child molesters who choose to molest because they like it.  (Id. at 210-12.)

17  　　　　Dr. Donaldson stated that there was some aspect of the children's story that did

18  not ring true, and thought there was some aggravation by the victims.  (Id. at 225.)  Dr.

19  Donaldson based that statement on initial claims by one of the little girls that petitioner had

20  penetrated her vagina five times.  (Id.)  Those charges were later dropped, but Dr. Donaldson

21  suspected that the girls may have been provocative, "competing with each other."  (Id.)  Dr.

22  Donaldson said he was not claiming the charges were false, but believed there may have been

23  some degree of exaggeration.  (Id. at 225-26.)  His opinion was also based on the fact that the

24  records contained no mention of a medical report and with vaginal penetration of an eight year

25  old such a medical exam would be positive.  (Id. at 226.)  Dr. Donaldson believed this omission

26  cast some doubt on whether anyone believed those charges.  (Id.)  Dr. Donaldson admitted he had

/////

only a slight portion of the record, but found no reference to it in the records he did have.  (Id.) at

226.)

          b.  Lack of confidence in predicting future offenses

          Dr. Donaldson testified that although a lot of work in predicting future offenses

has been done, "[i]t's not highly successful."  (Id. at 175.)  Dr. Donaldson testified extensively

about the lack of confidence that exists in the prediction of sex offender recidivism.  (Id. at 175-

88; 229-36; 247.)  He further testified that different researchers found certain factors were

correlated to recidivism, while other researchers would claim certain factors were not.  (Id. at

236-39.)  Dr. Donaldson refused to state it was more likely than not that petitioner would offend

again.  (Id. at 241.)  "I think the actuarial factors – even given the number of priors he [had] and

all the other factors, there's no indication he represents that kind of risk, particularly at his age."

(Id. at 241.)  (Petitioner was 44 years old.)

          4.  The Trial Judge's Decision

          The trial judge specifically relied on Dr. Donaldson's testimony in finding the

SVP petition had not been proven beyond a reasonable doubt.  Although the trial judge

acknowledged that the state had

> sufficient evidence that there [was] a substantial risk that
> [petitioner] may reoffend, [the trial judge stated that] on the crucial
> issue of whether beyond a reasonable doubt it [had] been shown
> that it [was] likely that he will engage in sexually violent behavior,
> the Court [was] just simply unable to say that, under the testimony
> that came out here, that Dr. Donaldson's estimate [was]
> unreasonable.

(RT (Nov 1999) at 147.)  "[T]he Court does have a reasonable doubt on whether it [was] likely,

that is more than 50 percent likely, that [petitioner] might engage in a sexually violent behavior."

(Id.)  After issuing that ruling on November 2, 1999, the trial judge ordered that petitioner be

processed for parole or otherwise handled by the Department of Corrections consistent with his

ruling that petitioner had not been proved to be a sexually violent predator.  (RT (Nov 1999) at

1  148.)

2  II.  2000 Parole Revocation Hearing[3]

3           On April 9, 2000, the state held a parole revocation hearing based on two charges:

4  contact with a minor and giving false information.  Petitioner denied having contact with a minor

5  but admitted giving false information in the logbook.  (Parole Revocation Hearing "PRH" Tr. at

6  1-3.)  Under state law, parole may be revoked upon a showing of good cause.  Cal. Penal Code

7  Section 3063.

8           Parole Agent Tony Galeste recounted receiving a phone call from Wade Gordon

9  who stated that on February 26 he was working on a car in a parking lot.  Mr. Gordon told Agent

10  Galeste that petitioner was present and that there were three or four boys, ages 10 to 16, there,

11  carrying on a conversation with petitioner in the parking lot.  (PRH Tr. at 3-4.)

12           When Agent Galeste inquired of petitioner about this two days later when

13  petitioner reported at the office, Agent Galeste stated that petitioner denied going to the

14  apartment complex, denied working on a car and denied being in contact with minors.  (Id. at 4.)

15  Agent Galeste stated that after further questioning, petitioner admitted going to the complex and

16  storing a car there, but denied having contact with minors.  (Id.)  Agent Galeste suggested a

17  review of the logbook would reflect no mention of going to the apartment complex or working

18  on the car.  (Id.)

19           Roxane Sherwood appeared at the hearing on behalf of petitioner and testified that

20  she was present while petitioner helped her friend Wade Gordon work on the car.  (Id. at 6.)  Ms.

21  Sherwood stated that she had met Mr. Gordon a few months prior.  (Id. at 11.)  Ms. Sherwood

22  said he lived with a woman in Folsom, and when they had problems he would come over and talk

23  about it with Ms. Sherwood.  (Id. at 11.)

24           Ms. Sherwood stated she had asked Mr. Gordon to help her get a paper so she

25  _____

26     [3]  The court takes judicial notice of the parole hearing transcript, appended to petitioner's
reply filed October 20, 2004, and overrules respondent's objection thereto.

could take it to a lawyer to try to help petitioner because he was listed as a violent person, but she did not believe petitioner to be a violent person.  (Id. at 7.)  Ms. Sherwood stated at that point Mr. Gordon said he thought he could help her because he works at Folsom Prison.  (Id.)  Ms. Sherwood stated that the next thing she knew, petitioner was being arrested and Mr. Gordon had involved petitioner's parole officer.  (Id. at 8.)

Ms. Sherwood stated she was aware of petitioner's prior criminal activity because petitioner told her about it before they met in person.  (Id. at 8.)  Ms. Sherwood confirmed giving petitioner a car, a 1972 Toyota Corona Mark II.  (Id.)

Ms. Sherwood stated that there was no one else around the parking lot while they were working on the car because it was pouring rain.  (Id. at 9.)  She said that when anyone did come down, they were running to get into their car because of the rain.  (Id.)  Ms. Sherwood stated that they pushed her car underneath the carport so they could work on it due to the rain. (Id.)

Ms. Sherwood stated she did not see any children around and she was down there 98 percent of the time.  (Id.)  At one point Mr. Gordon and petitioner went to Pick and Pull, then returned, had dinner and then continued working on the car.  (Id. at 10.)

The hearing agent inquired of Agent Galeste whether he had information from Wade Gordon.  (Id. at 13.)  Agent Galeste stated Mr. Gordon's information was basically the same, that petitioner was working on a car with Mr. Gordon's assistance and they went to Pick and Pull to look for parts, but Mr. Gordon stated there were kids in the parking lot of the apartment complex and they were carrying on a conversation with petitioner.  (Id. at 13-14.) Although Mr. Gordon couldn't specifically stated what time the kids were there, he knew it was after lunch.  (Id. at 17-18.)

Petitioner recounted his movement on February 26.  (Id. at 15-16.)  He stated there were no children involved.  (Id. at 16, 17.)  When asked why Mr. Gordon would state kids were there, petitioner stated Mr. Gordon did a background check on petitioner, found out he was

1  /////

2  a child molester, and got scared for Ms. Sherwood. (Id. at 16.) Petitioner said that instead of

3  talking to Ms. Sherwood about it, Mr. Gordon called petitioner's parole officer. (Id.)

4        The hearing agent found good cause existed for both charges and found petitioner

5  had violated two special conditions of parole. (PRH Tr. at 26.) Petitioner was assessed four

6  months for each violation and admonished to become very familiar with his parole conditions in

7  the future. (Id.)

8  III.  2001 Jury Trial on SVP Petition

9        On September 13, 2001, petitioner was brought to jury trial on the state's 2000

10  SVP petition. Some of the witnesses from the 1999 SVP petition proceedings were called to

11  testify again: Dana Putnam, Ph.D., Craig Updegrove, Ph.D., petitioner, and Dr. Donaldson. The

12  state called additional witnesses: Lieutenant Brian Maloney, Detective Will Bayles, Diane

13  Alaskin, Probation Officer Karen Muesling, and Antonio Galeste. Petitioner called Roxanne

14  Sherwood, Joseph Bigornia, Dorothie Strang and Brandon Baca as new witnesses.

15        Defense counsel attempted to introduce evidence of the prior, favorable

16  adjudication for petitioner. (RT (Sept 2001) at 67.) The trial judge took the request under

17  submission and issued his ruling on September 19, 2001, outside the presence of the jury:

18            a finding that the petition was not true does not prove that it . . .
          wasn't true. It only shows that the burden hadn't been met and I

19            think that's a well-established fact . . . and it doesn't tend in reason
          to prove anything at issue in this case. The issue is whether today

20            as of this date Mr. Rose is a sexually violent predator. . . . [M]y
          ruling is that that prior trial is irrelevant and cannot be discussed by

21            anyone in this trial.

22  (Id. at 162.) The trial judge then instructed everyone to advise anyone who might mention the

23  prior trial that they may not do so. (Id.) The judge added that if it became necessary to refer to

24  the prior trial, for example prior witness testimony, the words "prior proceeding" would be used.

25  (Id. at 163.)

26        Neither Dr. Putnam nor Dr. Updegrove personally evaluated petitioner for the

18

2001 trial.  (RT (Sept 2001) at 69.)  The doctors attempted to interview petitioner prior to this

trial, but petitioner refused.  (Id.)  The trial judge ruled that petitioner's refusal to voluntarily

agree to these interviews must be kept from the jury, even though the state might have earlier

obtained an order compelling petitioner to cooperate.  (Id. at 70-71.)  Dr. Putnam testified that

the fact she had not examined petitioner since May 13, 1999 would not change her opinion

because the nature of petitioner's mental disorder, pedophilia, was chronic and would not

change.  (Id. at 147.)

Dr. Putnam and Dr. Updegrove again testified that petitioner met the standard for

a SVP commitment.  (RT (Sept 2001) at 87-136; 305-455.)  For this trial, however, Dr. Putnam

utilized the Static-99 test[4], and calculated petitioner had a 33% probability of reoffending over

five years, 38% probability over 10 years, and 40% probability over 15 years.  (Id. at 136.)

On cross-examination, Dr. Putnam testified as to the variances in recidivism

research.  (Id. at 151-215.)  Dr. Putnam's testimony concerning the replication and validity of the

Static-99 paralleled his testimony from the 1999 trial.  (Id. at 216-19.)  Although Dr. Putnam

earlier testified that petitioner's recidivism rate was 40 percent at fifteen years, he increased the

percentage to 52 percent based on one of petitioner's priors which was actually two different

offenses, petty theft and burglary, each with separate sentences.  (Id. at 220-21.)  Dr. Putnam had

no additional interview data, but had new data concerning petitioner's parole behavior; he also

updated his evaluation using the Static, but reached the same conclusions he reached in 1999.

(Id. at 235-36.)

Dr. Putnam confirmed that volitional capacity was a legal term.  (Id. at 240.)  Dr.

Putnam stated that petitioner's 1996 offense qualified under the statute even though it was not

substantial sexual conduct.  (Id. at 242.)  He found there was force in the sense of an unwanted

touching of a child and duress based on the age difference between petitioner and the young girl.

---

[4] This actuarial tool delineates the difference between static variables and dynamic
variables:  "Static dynamic is the static of actuarial predictions."  (RT (Oct 1999) at 40.)

(Id. at 243.)  Dr. Putnam conceded that the severity of the offense was much different than petitioner's prior offense.  (Id.)  Dr. Putnam stated that petitioner was able to stop his behavior during the 1996 offense, but it was upon recognition that the temptation was great and he would lose control if he continued.  (Id.)  Dr. Putnam agreed that reflected a degree of control.  (Id.)  On redirect examination, Dr. Putnam noted that the Sheriff's report from the incident reflected petitioner stopped when the victim resisted.  (Id. at 275-76.)

One of the new pieces of information Dr. Putnam considered was Mr. Gordon's statement that petitioner had talked to male minors in the parking lot, which was one of the bases for the revocation of petitioner's parole.  (Id. at 253.)  Dr. Putnam was provided with the violation report as well as a transcript by Wade Gordon.  (Id. at 254.)  Dr. Putnam confirmed that was the sole person who provided this information to the probation officer.  (Id.)  Dr. Putnam agreed that if the transcript also contained an admission that Mr. Gordon was romantically involved with the mother of the minors at the same time petitioner was involved with her, and that Mr. Gordon reviewed confidential records of the Department of Corrections, and through that activity brought this information to petitioner's parole agent's attention, such information could change his opinion about the veracity of Mr. Gordon.  (Id. at 256.)

Dr. Putnam confirmed that petitioner did not have a history of involvement with young male children.  (Id. at 257.)  He noted that petitioner's contact with young male minors could be significant because the youngest was reported to be age ten, and that his prior association with children gained him access to other children.  (Id. at 257-58.)  Dr. Putnam stated, however, that he did "not place a great deal of weight on that in this . . . case because there was not a tremendous amount of evidence that that [was], in fact, what Mr. Rose was doing."  (Id. at 258.)

Dr. Putnam added that although there were comments in petitioner's file that indicated he was an exemplary prisoner, proceeding well with his treatment, there was also some evidence he had gotten into a fight and disobeyed orders.  (Id. at 259.)  Dr. Putnam opined that

/////

the majority of the records indicated petitioner did quite well under a structured supervised

environment but occasionally had difficulties.  (Id.)

On redirect examination, Dr. Putnam confirmed that petitioner's failure to log his

activity and maintain a level of reporting with his parole officer would be of concern to him

regardless of Mr. Gordon's testimony because it would provide petitioner with an opportunity to

engage in sexual offenses.  (Id. at 262.)

Dr. Updegrove

Dr. Updegrove's testimony in 2001 paralleled the testimony he gave in the 1999

SVP trial.  He testified that petitioner met the standard for a SVP commitment.  (RT (Sept 2001)

at 310-455.)  Dr. Updegrove testified he had prepared three additional addendums to the

evaluation he prepared from his initial interview with petitioner on May 13, 1999.  (Id. at 311.)

Dr. Updegrove addressed additional information as to another girl victim,

Rebecca, who was ten, who claimed petitioner pulled her down and touched her vaginal area

over her clothes while she was watching television.[5]  (Id. at 408.)  Dr. Updegrove also had

benefit of the alleged statement petitioner made to another victim that "what he was doing with

her was okay because he had done it on 75 or a 100 other children."  (Id. at 409.)  Dr. Updegrove

discussed in greater detail the descriptions of the acts petitioner set forth in the sworn statement

provided shortly after the Guam offenses.  (Id. at 410-12.)

Dr. Updegrove testified that, with regard to the offenses in Guam, there were

indications of pre-existing sexual interest in children that would relate to putting himself in a

position to sexually victimize other children.  (Id. at 415.)  Thus, Dr. Updegrove opined that

petitioner had engaged in at least two predatory aspects, the victim being a casual acquaintance

---

[5]  The jury was instructed that this information was offered not for the truth of the facts
stated, but as a basis for subsequent opinion that would be expressed by Dr. Updegrove.  (Id. at
409.)

/////

with whom no substantial relationship exists, and that the relationships were promoted for the purpose of victimization.  (Id. at 415.)

Dr. Updegrove based his statement that petitioner had a prior sexual interest in young girls on three factors:

1.  Petitioner had a deviant sexual development as a child, having been molested by his mother and stepfather, and allegedly other friends of the mother;

2.  At an early age, petitioner stated at 13, he had been implicated in sexual activity with a 10 year-old girl who later called it a rape situation;

3.  Petitioner's father reported that at age 16 petitioner was sexually molesting, fondling, a five-year old half-sister as well as a 12 year-old neighbor child..
(Id. at 415-16.)

Dr. Updegrove testified in more detail about the events between petitioner and Diane Alaskin, with the jury being instructed that the information was not being offered for its truth, but as a basis for the doctor's opinion.  (Id. at 422-25.)

Dr. Updegrove's testimony concerning the medical and psychological reports about the Guam incidents paralleled Dr. Putnam's.  (Id. at 430-34.)

In 2000, Dr. Updegrove assessed petitioner using the Static-99.  (Id. at 440; 442.) Dr. Updegrove calculated petitioner had a score of 6, with a 39% probability of reoffending over five years, 45% over 10 years and 52% probability over 15 years.  (Id. at 442.)

Dr. Updegrove's testimony concerning the age of the offender and the credibility of the Static-99 assessment tool paralleled Dr. Putnam's testimony.  (Id. at 466-88; 498-99.)  He was cross-examined about the studies' failure to take into account false reports of offenses (id. at 489-91) and confirmed that a large number of the unreported or undetected offenses were not recidivistic (id. at 492).  The balance of Dr. Updegrove's testimony paralleled his testimony from 1999 or Dr. Putnam's earlier testimony in 2001.  (Id. 492-524.)

1   /////

2

3          Petitioner Warren Rose

4          In addition to testimony concerning the offenses in Guam and in 1996, petitioner

5   testified that he failed to note in his parole logbook his visit to Roxanne Sherwood's apartment

6   complex.  (Id. at 629.)  He confirmed there was no entry for any visit to her apartment.  (Id. at

7   630.)  Petitioner confirmed his parole was violated for two offenses: failure to update his logbook

8   correctly and contact with minor children.  (Id. at 631.)  Petitioner denied there were any children

9   around while he was working on Ms. Sherwood's car.  (Id. at 655.)

10          Brian Maloney

11          Brian Maloney was a lieutenant with the Sacramento County Sheriff's Department

12   and testified regarding petitioner's criminal history.  (Id. at 661-68.)  Maloney used a rap sheet

13   (id. at 664-665) regarding petitioner to explain he had been arrested in 1974 on two counts, petty

14   theft for which petitioner was convicted and fined $125 (id. at 667) and burglary for which

15   petitioner was convicted of petty theft and sentenced to three years' probation and three days' jail

16   time (id. at 668).  Maloney could not confirm that the state court had two separate files for these

17   offenses inasmuch as the court had not yet located them.  (Id. at 677.)  But he stated he had no

18   reason to believe anything other than the petty thefts were two separate arrests and convictions.

19   (Id.)

20          Will Bayles

21          Will Bayles was a sheriff's department detective who testified concerning his

22   interview of petitioner in December of 1996 while Bayles was assigned to the child abuse unit.

23   (Id. at 678-81.)  Bayles testified that petitioner initially denied touching H.W. but after two hours

24   of questioning, petitioner admitted he had touched H.W.'s clothed breast.  (Id. at 679-81.)

25   Bayles testified that Rose said: "he had found himself becoming tempted to touch the child, and

26   that he had succumbed to that temptation, that he placed his – I believe his right hand on her left

23

1  breast . . . over her clothing and touched her for a brief period of time.  And then that he had

2  exited the residence to remove himself from further temptation with the child." (<u>Id.</u> at 618.)

3         Diana Alaskin

4         Petitioner's former girlfriend, Diana Alaskin, testified that petitioner sexually

5  assaulted her two times in December of 1990.  (<u>Id.</u> at 703-05.)  Ms. Alaskin met petitioner in

6  October of 1990 and stated their relationship became abusive around December.  (<u>Id.</u> at 703.)

7  She testified she failed to report the assaults because she was afraid for her two children, males

8  aged 14 and 16.  (<u>Id.</u> at 703-06.)  Ms. Alaskin testified that she spoke with petitioner's probation

9  officer, Karen Redding, in January of 1991 and wrote a letter to her describing the events with

10  petitioner.  (<u>Id.</u> at 707.)

11         Karen Meusling Redding

12         Ms. Redding was a federal probation officer who testified about petitioner's

13  relationship with Ms. Alaskin.  (<u>Id.</u> at 717; 722.)  On January 5, 1991, petitioner requested

14  mental health counseling from Officer Redding, stating "my temper is getting out of control."

15  (<u>Id.</u> at 722.)  On January 9, 1991, petitioner told Officer Redding that he had been seeing Ms.

16  Alaskin for several months and that they had a verbal and physical fight on January 5, but that no

17  report had been made to the police.  (<u>Id.</u> at 722.)  Petitioner provided Officer Redding Ms.

18  Alaskin's name, address and phone number and Officer Redding attempted to contact Ms.

19  Alaskin, but she was out of town.  (<u>Id.</u>)  Officer Redding instructed petitioner to have no contact

20  with Ms. Alaskin, her family or friends, and that if they attempted to contact him, he should give

21  them Officer Redding's name and phone number.  (<u>Id.</u>)

22        Petitioner reported to Officer Redding's office on January 11, telling a different

23  probation officer he had attempted to contact Ms. Alaskin.  (<u>Id.</u> at 723.)  On January 14, Officer

24  Redding spoke with Ms. Alaskin.  (<u>Id.</u> at 723.)  On January 14, Officer Redding met with

25  petitioner again and he advised her he had again attempted to make contact with Ms. Alaskin.  (<u>Id.</u>

26  at 724.)  On January 15, 1991, Officer Redding had petitioner arrested for the probation violation

1   of failing to follow instructions of the parole officer.  (<u>Id.</u> at 724-25.)  After Alaskin spoke with

2   Officer Redding, Redding learned of the rape and assault allegations and informed the Parole

3   Commission who issued parole violations based on those charges.  (<u>Id.</u> at 725.)  The Parole

4   Commission violated petitioner's parole based on its findings that petitioner failed to follow the

5   parole officer's instructions, which petitioner admitted, and that petitioner had committed two

6   sexual assaults.  (<u>Id.</u> at 727.)  Petitioner was returned to federal custody, and while there, Officer

7   Redding testified that petitioner received extensive alcohol abuse and mental health counseling

8   while in federal custody.  (<u>Id.</u> at 733; 736-38.)  Petitioner was released from federal custody on

9   April 26, 1996, without additional parole supervision because he had served all his time.  (<u>Id.</u> at

10   729.)

11           Antonio Galeste

12           Antonio Galeste was the parole agent who was supervising petitioner upon his

13   release from prison in July of 1999.  (<u>Id.</u> at 740-41.)  Agent Galeste stated that parole conditions

14   were based on a parolee's prior history; petitioner was instructed to have no contact with minors

15   and to keep a log book of where he went.  (<u>Id.</u> at 741.)  In March of 2000, Agent Galeste received

16   a phone call from Wade Gordon who stated petitioner had been working on a car in an apartment

17   complex and there were a group of boys hanging around him he was talking to.  (<u>Id.</u> at 742.)

18   Agent Galeste stated he questioned petitioner about this and petitioner ended up admitting Ms.

19   Sherwood had given him a car, he had parked it at her apartment complex, and had gone over

20   there to work on it, none of which was reflected in petitioner's log book.  (<u>Id.</u> at 743.)  A parole

21   revocation hearing was held by the state parole board and found good cause to revoke petitioner's

22   parole.  (<u>Id.</u> at 747.)

23           During his testimony, Agent Galeste testified that petitioner initially admitted to

24   both having contact with minors as well as failure to keep a log book.  (<u>Id.</u> at 748.)  However,

25   petitioner's counsel has provided evidence, of which this court has taken judicial notice, that

26   petitioner did not admit having contact with minors.  (Petitioner's Reply filed October 20, 2004.)

1   Agent Galeste correctly testified that petitioner admitted during the parole revocation proceeding

2   /////

3

4   he had gone to the apartment complex and failed to note that in his log book, but denied having

5   any contact with minors.  (RT (Sept 2001) at 748.)

6           On cross-examination, Agent Galeste testified that his conversation with Mr.

7   Gordon lasted only a few minutes, and confirmed he provided no information about how the

8   minors came to be there or how long they had been there.  (Id. at 750-51.)  Officer Galeste agreed

9   he had little discretion under department policy but to violate petitioner once he learned of

10   petitioner's contact with minors.  (Id. at 751-52.)  Officer Galeste confirmed that the minimal

11   evidence required to support a violation of this type would not rise to the level of preponderance

12   of the evidence standard.  (Id. at 752.)

13           The state rested its case against petitioner with the testimony of Agent Galeste.

14   (Id. at 758.)

15           Dr. Theodore Donaldson

16           Petitioner's defense witnesses began with Dr. Donaldson, whose testimony was

17   essentially the same as in the 1999 SVP proceedings.  He concluded there was nothing in the 2000

18   parole violation report that would significantly alter his findings with regard to petitioner.  (Id. at

19   765-66.)  Dr. Donaldson opined that petitioner did not fit the diagnostic criteria for pedophilia.

20   (Id. at 768-72.)  Dr. Donaldson stated he believed petitioner had been engaged in criminal

21   behavior rather than suffering from a mental illness.  (Id. at 772.)  He did not find petitioner

22   suffered impairment in his volitional capacity with regard to the 1982 offenses.  (Id. at 776-77.)

23   He confirmed petitioner's behavior in the 1996 offense could also be viewed as reflecting

24   petitioner exercised control because he stopped after touching the outside of her clothing.  (Id. at

25   778.)

26           Dr. Donaldson testified that the accuracy of clinical assessment as a means of

1  predicting future offenses was barely above chance.  (Id. at 782.)  He further testified that there

2  were significant problems in the accuracy or confidence in the actuarial assessment of petitioner in

3  2000 because petitioner was older than the data pool used in those assessments.  (Id. at 788.)

4      Dr. Donaldson confirmed that he had found nothing in the records to affirmatively

5  show that petitioner had sustained two separate petty theft charges and convictions in 1974.  (Id.

6  at 793.)  He stated that the protocol under Department of Mental Health training would require an

7  evaluator to not use facts which are not conclusive.  (Id.)  Given the ambiguity of the records,

8  Dr. Donaldson calculated petitioner's score both ways, one with one petty theft conviction and

9  another with two convictions.  (Id. at 793-94.)

10      Dr. Donaldson calculated petitioner's Static-99 scores to be 26% or 33% for five

11  years.  (Id. at 796-97.)  The variation in percentages was attributable to the dispute over reading

12  petitioner's RAP sheet as containing one or two petty theft convictions in 1974.  (Id.)  Dr.

13  Donaldson further assessed petitioner's probability of reoffending at 36% or 40%.  (Id. at 797-98.)

14  However, Dr. Donaldson did not find the 15 year assessment to be accurate because of petitioner's

15  aging over that period.  (Id. at 797.)  Dr. Donaldson disagreed with the claim of Dr. Putnam and

16  Dr. Updegrove that actuarial assessments underestimated probabilities because the data did not

17  use the charging rates but used conviction rates.  (Id. at 798.)  Dr. Donaldson testified extensively

18  about the inaccuracies of predicting recidivism in this context.  (Id. at 801; 798-99; 859; 804-18.)

19      Dr. Donaldson denied that petitioner's history of offenses in Guam, then having

20  paroled in 1990 and fairly soon thereafter being violated for the sexual assault of Diana Alaskin,

21  then serving five more years, then touching H.W. and sustaining a conviction and serving more

22  time, then going back on parole, then soon after being violated for giving false information to his

23  parole agent as well as having contact with minors, demonstrated that petitioner's volitional

24  capacity was impaired.  (Id. at 848-49.)  He confirmed that petitioner was supposed to keep the

25  log book and showed poor judgment in failing to do so.  (Id.)  However, Dr. Donaldson stated

26  that the "bit about being in the presence of children [was] . . . stretching the facts some."  (Id. at

1  849.)

2  /////

3  /////

4          Roxanne Sherwood

5          Roxanne Sherwood testified concerning the events at her apartment complex with

6  petitioner and Wade Gordon.  (Id. at 932-45.)  Ms. Sherwood explained she met petitioner

7  through a girlfriend in February of 2000.  (Id. at 931.)  Ms. Sherwood lent petitioner a car and a

8  cell phone because he was having difficulty looking for and getting to work, and getting messages

9  at the halfway house where he lived.  (Id. at 932.)  She stated petitioner told her when they first

10  met that he was on parole and she knew he could not be around children.  (Id. at 932-33.)  Ms.

11  Sherwood testified she had two sons, aged 10 and 15 years old.  (Id. 933.)  She stated that

12  petitioner came to her apartment only a couple of times and she was not aware of any children

13  being present on those occasions.  (Id. at 933.)

14          Ms. Sherwood testified that Wade Gordon was a friend and he had come over to

15  her apartment to work on her car.  (Id. at 934.)  She explained that Mr. Gordon thought he knew

16  how to work on cars, but he didn't.  (Id.)  Her sons left for the mall and movies around a quarter

17  to 9:00  that morning.  (Id. at 940.)  She spoke to petitioner on the phone and he came over around

18  9:00 a.m. to help Mr. Gordon work on her car.  (Id. at 935.)  Petitioner was present when Mr.

19  Gordon broke the distributor.  (Id.)  He and Mr. Gordon went to Pick-n-Pull to get parts.  (Id.)

20  Mr. Gordon and petitioner went to her apartment for lunch that day.  (Id. at 941.)  After they

21  finished working on her car, Mr. Gordon gave petitioner a ride to the bus stop.  (Id. at 941.)

22          Ms. Sherwood testified that she had observed petitioner's behavior in public and

23  his behavior had not given her any concern.  (Id. at 942.)  She stated she had never felt threatened

24  by him.  (Id.)  She confirmed that petitioner had not been sexually inappropriate with her.  (Id. at

25  943.)

26  /////

1   /////

2   /////

3   /////

4          Ms. Sherwood fell from her chair during her testimony, hurt her shoulder and was

5   unable to continue.  Counsel stipulated that on November 30, 2000,[6] Ms. Sherwood in a prior

6   proceeding in this matter was asked this question by Mr. Aye, and gave the following answer:

7          Question:  When you say you put yourself in a circumstance he
           wouldn't be with your children, what kind of arrangements did you
8          and Mr. Rose make?

9          Answer:  . . . when he was gonna come over and work on the car
           that particular day with Wade, my kids all went to the movies and
10         stuff.  And they went out the front.  I lived upstairs.  And there's a
           back stairs.  And the front stairs.  And they went out the front.

11
           And only thing he said to them was hope you guys have a nice time.
12         And he was like a long ways away.  And that was it.  And they left.
           And he went upstairs and we talked for a minute.  We all went
13         downstairs and started working on the car.  They got the keys from
           me and started working on the car.

14

15   (Id. at 945.)

16          Joseph Bigornia

17          Joseph Bigornia had an employment service business and employed petitioner as

18   an electrical contractor.  (Id. at 947.)  Mr. Bigornia was aware petitioner was on parole.  (Id.)

19   During the week petitioner worked for Mr. Birgonia, Mr. Birgonia received no complaints about

20   petitioner's behavior.  (Id. at 948.)  He stated he would be willing to rehire petitioner without

21   reservation even knowing petitioner was on parole for sex offenses.  (Id. at 948-49.)

22          Dorothie Strang

23          Dorothy Strang was petitioner's aunt.  (Id. at 950.)  She testified that she remained

24   close to petitioner throughout his life, even when he experienced the difficulties at issue herein.

25   ───────────────────

26         [6] There are no entries in the clerk's transcript for proceedings held on November 30,
       2000.

1 (Id. at 951.)  Ms. Strang raised petitioner from age 3 until 6, and visited him after that.  (Id. at

2 950.)  Petitioner went to live with her when he was 15 or 16 years old until he joined the navy.

3 (Id.)    Ms. Strang confirmed that she was a support person in petitioner's life and that he would

4 be welcome to live with her if he were released.  (Id. at 952-54.)  She confirmed she was unable to

5 allow him to live with her when he was previously paroled because she had a minor child living in

6 the home.  (Id. at 953.)

7               Brandon Baca

8               Brandon Baca was the son of Roxanne Sherwood and testified that he saw

9 petitioner once at the store, but did not speak to him.  (Id. at 955-56.)  He said he knew Mr.

10 Gordon but had not spoken with him either.  (Id. at 957.)  He stated he had no contact with Mr.

11 Gordon or Mr. Rose on the day they were at the apartment complex working on his mother's car.

12 (Id. at 955-60.)

13                         ANALYSIS

14 I.  General Standards for a Writ of Habeas Corpus

15               Federal habeas corpus relief is not available for any claim decided on the merits in

16 state court proceedings unless the state court's adjudication of the claim:

17               (1) resulted in a decision that was contrary to, or involved an
              unreasonable application of, clearly established Federal law, as
18               determined by the Supreme Court of the United States; or

19               (2) resulted in a decision that was based on an unreasonable
              determination of the facts in light of the evidence presented in the
20               State court proceeding.

21 28 U.S.C. § 2254(d).

22               A  state-court decision is contrary to clearly established precedent "if the state

23 court applies a rule that contradicts the governing law set forth" by the United States Supreme

24 Court.  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state-court decision also is contrary to

25 clearly established precedent if it applies the correct rule to a case involving facts "materially

26 indistinguishable" from those in a controlling case but arrives at a different result.  Id. at 406.

1    With respect to the "unreasonable application" clause, a federal habeas court

2 should ask "whether the state court's application of clearly established federal law was objectively

3 unreasonable." Id. at 409.   "[A] federal habeas court may grant the writ if a state

4 court identifies the correct governing legal principle from [Supreme Court] decisions, but

5 unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

6 II.  Jurisdiction

7    The Ninth Circuit Court of Appeals has addressed the question of when challenges

8 to civil commitments are rendered moot by the expiration of the term of commitment.  In addition,

9 the Ninth Circuit has addressed whether a petitioner who does not file a federal habeas petition

10 until after a term of civil commitment has expired has standing to collaterally attack that

11 underlying civil commitment.  These issues are addressed briefly in the context of the pending

12 petition, and the court concludes that petitioner has standing to bring his claims and that they have

13 not been rendered moot.

14    In Hubbart v. Knapp, 379 F.3d 773 (9th Cir. 2004), the government argued that the

15 case was moot because the original term of commitment under the SVPA which was being

16 challenged by petitioner had expired and he was confined pursuant to a new two year term.  (Id. at

17 777.)   The court rejected the argument holding that the petitioner's challenge was not moot

18 because his claims were "capable of repetition yet evading review."  (Id.)  In this regard, the court

19 found that the "capable of repetition" component of the analysis was satisfied because the

20 petitioner had already been confined pursuant to a second commitment proceeding and a third

21 petition to commit him was pending.  (Id. at 777-78 & n.1.)  The court also concluded that the

22 claimed harm evaded review because petitioner's two-year term was too short to be fully litigated

23 through the federal appellate process before the term expired.  (Id. at 778.)

24    The same is true in this case.  The state filed a second and third SVPA

25 commitment proceeding against petitioner during the pendency of this action.  Court records

26 reflect petitioner remains at Atascadero.  Therefore, there is a reasonable expectation that

1  petitioner will be subject to continued commitment in the future.  Further, petitioner could not

2  pursue his claims through the federal appellate process before his two-year term expired.

3  Thus, like the situation presented to the court in Hubbart, petitioner's claims are capable of

4  repetition yet evading review.  Therefore, this action has not been rendered moot.

5  With respect to standing, in Jackson v. Cal. Dept. of Mental Health, 399 F.3d 1069

6  (9th Cir. 2005), the court recently held that a petitioner lacked standing to challenge an expired

7  SVPA confinement term where he had voluntarily recommitted himself.[7]  The court concluded

8  that the decision in Hubbart did not compel a different result because Jackson's term had expired

9  before he filed his habeas petition.  (Id. at 1072.)  Most importantly, the court found that because

10  no further recommitment petition had been filed by the state and the petitioner was in custody

11  only because he had voluntarily recommitted himself, his confinement was not fairly traceable to

12  any action by the state.  (Id. at 1074-75.)  Because the petitioner had failed to demonstrate that he

13  was suffering harm associated with the SVPA confinement order, he was found to lack standing to

14  challenge the state court's jurisdiction.

15  However, petitioner's case is factually distinguishable from that presented in

16  Jackson.  Here, the state filed a second recommitment proceeding in 2003 and filed a third

17  recommitment proceeding in 2005.  Petitioner did not voluntarily recommit himself and there is

18  no indication in the record that petitioner would have remained at Atascadero State Hospital if the

19  state had not filed a subsequent petition for recommitment.  Further, petitioner was required under

20  California law to remain in custody under the initial commitment order until the recommitment

21  petition was tried.  See Cal. Welf. & Inst. Code § 6604 (a "person shall not be kept in actual

22  custody longer than two years unless a subsequent extended commitment is obtained from the

23  court incident to the filing of a petition for extended commitment") and § 6601.5 (if the judge

24  

25  [7]  In order to have standing to bring a claim, a litigant must have suffered "(1) an 'injury in fact' that is (2) 'fairly traceable' to the state court's commitment order that he challenges, and (3) that is 'likely [to be] redressed by a favorable decision."  Jackson, 399 F.3d at 1071 (quoting

26  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).

1   determines that a petition for commitment supports a finding of probable cause, "the judge shall

2   order that the person be detained in a secure facility until a hearing can be completed").  A

3   probable cause hearing on the 2005 petition began on June 28, 2005 and is scheduled to resume

4   on July 18, 2005.  For these reasons, petitioner's continued confinement was "directly traceable"

5   to the state's second and third recommitment petitions.  Petitioner has also suffered an "injury in

6   fact" (continued commitment) which would be addressed by a favorable decision on his claims.

7   Thus, petitioner has satisfied all of the requirements to confer on him standing to present his

8   claims to this court.  <u>Jackson</u>, 399 F.3d at 1071-75.  Accordingly, the court will address

9   petitioner's claims on the merits.

10   III.  <u>Petitioner's Claims</u>

11          A.  <u>Res Judicata/Collateral Estoppel</u>

12              Petitioner's first claim for relief is that the state trial court violated petitioner's due

13   process rights by failing to apply the principles of res judicata and collateral estoppel.  In support

14   of this claim, petitioner contends that where a prior jury determined that an individual is not a

15   sexually violent predator the district attorney may not re-litigate the prior jury's finding with

16   respect to the same individual.  <u>Turner v. Superior Court</u>, 105 Cal.App.4th 1046 (4th Dist. 2003).

17   Respondent contends that res judicata did not bar the 2000 proceedings because the issues were

18   not identical and the evidence presented was not the same as that presented at the 1999

19   proceedings.

20              The state appellate court addressed this claim as follows:

21          The doctrine of res judicata, described as "claim preclusion," "'rests
            upon the ground that the party to be affected, or some other with
22          whom he is in privity, has litigated, or had an opportunity to litigate
            the same matter in a former action in a court of competent
23          jurisdiction, and should not be permitted to litigate it again to the
            harassment and vexation of his opponent.  Public policy and the
24          interest of litigants alike require that there be an end to litigation.'
            (*Panos v. Great Western Packing Co.* (1943) 21 Cal.2d 636, 637
25          (134 P.2d 242].)  The doctrine applies when 1) the issues decided in
            the prior adjudication are identical with those presented in the later
26          action; 2) there was a final judgment on the merits in the prior

action; and 3) the party against whom the plea is raised was a party or was in privity with a party to the prior adjudication." (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App. 4th 1053, 1065 (*Citizens*). To determine whether there is an identity of issues in the two actions, the court must look to the pleadings and proof in each case. (*Ibid.*)

However, it is well established that the doctrine of res judicata does not apply where there are changed conditions and new facts which were not in existence at the time of the prior judgment, and upon which that judgment was based. (*Neil Norman, Ltd. v. William Kasper & Co.* (1983) 149 Cal.App.3d 942, 947; *Starr v. City and County of San Francisco* (1977) 72 Cal.App.3d 164, 178-179.)

The related doctrine of collateral estoppel, described as "issue preclusion," gives conclusive effect to an issue decided in a prior proceeding in a different cause of action if "'(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; and (2) the previous proceeding resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior proceeding.'" (*People v. Davis* (1995) 10 Cal.4th 463, 514-515, fn. 10, *quoting People v. Meredith* (1992) 11 Cal.App. 4th 1548, 1556; *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.)

Thus, under both res judicata and collateral estoppel, there must be an identity of issues that were litigated. As we shall discuss, because of the nature of the proceedings under section 6600 to commit a defendant as an SVP, the factual issue litigated under one petition seeking a commitment will generally be different than the factual issue determined in a subsequent proceeding under a different petition seeking a like commitment.

The SVPA provides for the involuntary civil commitment and treatment of certain convicted violent sex offenders at the end of their prison or parole revocation terms. Commitment is authorized upon a judicial finding the offender is an SVP because he has been convicted of sexually violent offenses and currently suffers from a diagnosed mental disorder that makes him likely to refined if released. Commitment is for a two-year term (§ 6604.1, subd. (a)), although the offender may be confined only as long as the disorder-related danger persists. (*People v. Superior Court* (*Ghilotti*)(2002) 27 Cal.4th 888, 893, 902 (*Ghilotti*); *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1144 (*Hubbart*).

Section 6600 , subdivision (a) sets forth the criteria for determining whether a person is an SVP. An SVP is defined as "a person who has been convicted of a sexually violent offense against two or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely

34

that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) A "diagnosed mental disorder" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (Id., subd. (c).)

While conviction of a sexually violent offense constitutes evidence that may support a determination the person is an SVP, it may not be the sole basis for the determination whether a person is an SVP. (§ 6600, subd. (a)(3).) "Jurors shall be admonished that they may not find a person a sexually violent predator based on prior offenses absent relevant evidence of a currently diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Ibid., (italics added).) Furthermore, various provisions of the Act are designed to ensure that any commitment ordered under the Act does not continue if and when the SVP's condition materially improves. To this end, annual mental examinations are required. (*Hubbart, supra,* 19 Cal. 4th at p. 1147; see § 6605, subd. (a).)

Thus it is very clear, a determination that a person is an SVP under the Act requires a finding based upon the person's current mental condition and dangerousness and his present inability to control sexually violent behavior. (*Ghilotti, supra,* 27 Cal.4th at p. 895; *Hubbart, supra,* 19 Cal.4th at p. 1162; *Kansas v. Hendricks* (1997) 521 U.S. 346, 357 [138 L.Ed.2d 501, 512] (*Hendricks*); People v. *Hedge* (1999) 72 Cal.App. 4th 1466, 1469 (*Hedge II*).) It is for this reason that the court in *Hedge II* rejected a similar claim on a related issue.

In *Hedge II*, the defendant was committed to the custody of the DMH upon a petition and finding that he is an SVP. While his commitment on that petition was still pending review before the California Supreme Court in Hedge I, the prosecution filed a second petition to commit him to the custody of the DMH as an SVP, and he was again committed. On appeal from the second commitment, he argued that the trial court lacked jurisdiction to proceed on the second petition because the same determination had been made on the first petition. His argument was based on the rule of appellate procedure that upon the filing of a notice of appeal in a civil action, jurisdiction vests in the appellate court until the appeal is final and the remittitur issues. (72 Cal.App.4th at p. 1475.) According to defendant, the trial court lacked jurisdiction to hear the second petition because it was based upon the same cause of action as the first petition.

The court rejected this argument concluding that "due to the nature of proceedings under the Act the second petition was properly before the trial court as a new action even though such involved

similar issues as in Hedge I." (72 Cal.App.4th at p. 1475.)  The court explained that "[t]he nature of the Act . . . envisions a special civil commitment proceeding that is begun and then continues, changes or ends depending upon the current mental condition and dangerousness of the proposed or committed SVP at the time he or she is nearing release from the custody of the DOC.  Although the same requirements or issues are involved in alleging any 'cause' filed via petition under the Act, the actual facts or circumstances comprising that 'cause' in a subsequent petition will necessarily be different due to the addition of new facts bearing on those issues based on the sheer passage of time which may support the release or commitment of the proposed SVP.  Because of the short time periods involved for the commencement of proceedings and commitment durations and extensions under the Act, the Legislature certainly must have recognized that active civil appeals might often still be pending when a new petition or matter concerning the same alleged SVP comes before the trial court." (*Id.* at pp. 1476-1477.)

The same reasoning applies in determining whether to apply the bars of res judicata or collateral estoppel.  Under both of these doctrines, there must be an identity of issues between the prior and subsequent proceeding, and in making that determination, we look to the pleadings and the proof. (*Citizens, supra,* 60 Cal.App.4th at 1065; *People v. Davis, supra,* 10 Cal.4th at pp. 514-515, fn. 10.)  While the legal criteria under the statute will necessarily be the same in any proceeding under the SVPA, the ultimate factual issue to be determined under the two petitions is different because each one looks to defendant's current mental condition and dangerousness at the time he is nearing his release from prison.  That condition may change with the passage of time as will the evidence necessary to prove the changed condition.

Here, respondent contends the second petition is based in part upon different evidence that included [petitioner's] most recent parole violation which occurred subsequent to the trial on the first petition.  Indeed, Dr. Updegrove testified that in evaluating [petitioner] as an SVP for purposes of the second petition, he reviewed the circumstances of his most recent parole violation in 2000.  Moreover, [petitioner's] conduct underlying this parole violation was introduced into evidence[8] and both the prosecutor and defense counsel discussed whether this conduct demonstrated his inability to conform his behavior.  Thus, the evidence presented in the second proceeding was not identical to the evidence presented in the first proceeding.

---

[8] [Petitioner's] parole officer testified about [petitioner's] parole conditions and the basis of the parole violation, and [petitioner] testified to the underlying facts of the violation, admitting he gave false information to his parole officer while denying that he was in contact with any minors.  [Petitioner] also admitted failing to report his visits in February 2000 to the apartment of a friend, Roxanne Sherwood, who had two sons ages 11 and 15.

1
2
3

> Accordingly, because the factual issues were not the same in the two proceedings to determine whether [petitioner] is an SVP, the doctrines of res judicata and collateral estoppel do not bar the proceedings under the second petition.

4   (Opinion, at 4-11.)

5   Legal Standards

6        The doctrine of res judicata provides that when a court of competent jurisdiction

7   has entered a final judgment on the merits of a cause of action, the parties to the suit and their

8   privies are thereafter bound "not only as to every matter which was offered and received to sustain

9   or defeat the claim or demand, but as to any other admissible matter which might have been

10   offered for that purpose." Cromwell v. County of Sac, 94 U.S. 351, 352 (1876).

11
12
13
14

> Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.

15   Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979)(citations omitted)(petitioners had a

16   "full and fair" opportunity to litigate their claims in prior action brought by the SEC, and

17   petitioners were therefore collaterally estopped from relitigating the question of whether the proxy

18   statement was materially false and misleading). The doctrine of issue preclusion, or collateral

19   estoppel, "refers to the effect of a judgment in foreclosing relitigation of a matter that has been

20   litigated and decided." Migra v. Warren City School District Board of Education, 465 U.S. 75, 77

21   n.1 (1984). Three elements must be met in order to foreclose relitigation of an issue under

22   collateral estoppel: (1) the issue at stake must be identical to the one alleged in the prior

23   litigation; (2) the issue must have been actually litigated by the party against whom issue

24   preclusion is asserted in the prior litigation; and (3) the determination of the issue in the prior

25   litigation must have been a critical and necessary part of the judgment in the earlier action. Town

26   of North Bonneville v. Callaway, 10 F.3d 1505, 1508 (9th Cir. 1993).

1      California's Sexually Violent Predator Act ("SVPA") authorizes civil commitment

2  at the conclusion of a criminal sentence of "a person who has been convicted of a sexually violent

3  offense against two or more victims for which he or she received a determinate sentence and who

4  has a diagnosed mental disorder that makes the person a danger to the health and safety of others

5  in that it is likely that he or she will engage in sexually violent criminal behavior." Welf. & Inst.

6  Code, § 6600(a).  In accordance with due process requirements, the SVPA requires the trier of fact

7  to find that the sexually violent predator ("SVP") is dangerous at the time of commitment;

8  statutory criteria are expressed in present tense, indicating that each must exist when the verdict is

9  rendered, and the person cannot be adjudged SVP unless he "currently" suffers from diagnosed

10  mental disorder which prevents him from controlling sexually violent behavior, and which

11  "makes" him dangerous and "likely" to refined.  U.S.C.A. Const.Amend. 14; West's Ann.Cal.

12  Const. Art. 1, § 7; West's Ann.Cal.Welf.& Inst.Code § 6600(a); Hubbart v. Superior Court, 19

13  Cal. 4th 1138, 81 Cal. Rptr. 2d 492 (1999).

14      In the instant action, petitioner argues that the two SVP petitions seek to relitigate

15  the exact same issues:  whether petitioner qualifies for civil commitment as a sexually violent

16  predator.  Petitioner argues that the 1999 order denying the petition resulted in the actual litigation

17  of all of petitioner's SVP status.  Petitioner contends that the trial judge's finding was explicitly

18  based on the credibility of Dr. Donaldson's testimony regarding the inaccuracy of the predictive

19  tools used by Dr. Putnam and Dr. Updegrove.  In light of that finding, petitioner argues that

20  during the 2000 SVP trial, no new material evidence was presented that negated the

21  1999 finding.  Plaintiff relies on the reasoning of Turner v. Superior Court of San Diego, 105

22  Cal.App.4th 1046, 130 Cal.Rptr.2d 300 (Cal. App. 2003).[9]

23

24      [9]  The Turner opinion issued on January 30, 2003.  The state court of appeal issued its
opinion on petitioner's direct appeal on February 28, 2003.  The petition for review submitted to
the California Supreme Court by petitioner cited to Turner, stating there was a "need for

25  guidelines to prevent the situation in which petitioner, and others, prevail in trial only to be
violated on parole for minor acts unrelated to any new sexually aggressive behavior, and

26  subjected to a second trial, alleging all the prior acts, which have been found insufficient in a

1   The Turner court held that although the prior jury determination did not necessarily

2 bar a subsequent SVPA petition after a new custodial term, in the subsequent proceeding the state

3 may not relitigate the finding that the individual was not a sexually violent predator at the time of

4 the prior release; thus, to establish probable cause on the subsequent petition, the state must

5 present evidence of changed circumstances affecting this factual determination.  Id.

6   In the instant case, it appears no new material evidence was presented at the 2001

7 trial.  It was established that petitioner failed to maintain his logbook.  But the evidence that

8 petitioner came in contact with minors was questionable; even the parole agent stated it failed to

9 rise to the level of a preponderance of the evidence standard.  (RT (Sept 2001) at 752.)

10   However, whether or not there was material evidence is not the issue before this

11 court on collateral review.  Petitioner has provided no clearly established Supreme Court authority

12 for the proposition that the state must present evidence of changed circumstances affecting the

13 factual determination at the second SVP proceeding.

14   In order for petitioner's claims to be barred under the doctrine of res judicata or

15 collateral estoppel, the issue from the September 2001 trial must be identical to the issue from the

16 October 1999 trial.  The issue at the 2001 trial was whether petitioner at that time suffered from a

17 mental disorder that would likely cause him to reoffend in the future.  Given the SVPA's

18 requirement that the individual's *current* dangerousness be established, the issue of the petitioner's

19 mental health and his resulting danger to others at the second trial was not identical to the issue

20 litigated in the prior proceeding and was not decided at the earlier trial.

21   Under California law, a new petition to extend an offender's commitment for

22 another two years constitutes a new and separate civil action.  See Burris v. Hunter, 290

23 F.Supp.2d 1097 (C.D. Cal. 2003).  Similarly, a new petition brought after an earlier denial would

24

25 previous trial, and adding the new, virtually insignificant violation behavior."  (Answer, Ex. D, at
   2.)  The California Supreme Court issued its en banc postcard denial on May 14, 2003.  (Id., Ex.
26 E.)

1  also constitute a new and separate civil action.  This is because each civil commitment proceeding

2  evaluates the offender's mental state and the likelihood the offender will reoffend at that time.

3  Either of these factors could change over time.

4  Here, in the earlier proceeding, the trial judge did not specifically find that

5  petitioner did not have a mental disorder; he did not find that petitioner was a child molester

6  rather than a pedophile.  (RT Nov 1999) at 147.)  Had the trial judge made such a finding, this

7  court might have been inclined to find that prong barred under collateral estoppel principles,

8  particularly given the relatively short time frame between trials.

9  The trial judge further acknowledged that there was sufficient evidence that there

10  was a substantial risk petitioner may reoffend.  (Id.)  The trial judge stated that he could not find

11  that Dr. Donaldson's estimate of the risk petitioner would reoffend was unreasonable, thus finding

12  the court did have a reasonable doubt it was likely petitioner would reoffend.  (Id.)

13  Therefore, under collateral estoppel principles, the prior judicial finding that

14  petitioner was not an SVP did not absolutely bar the later petition seeking to show that he was an

15  SVP at a later time.  This claim should be denied.

16  B.  Failure to Instruct the Jury

17  Petitioner's second claim is that the trial court violated his due process rights by

18  failing to instruct the jury that it had to find petitioner suffered from a mental condition which

19  rendered him dangerous beyond his control.  Petitioner maintains that the United States Supreme

20  Court requires that the jury make a specific finding that the person lacked volitional control over

21  their sexually violent criminal behavior before that person can be committed under the SVPA.

22  Kansas v. Crane, 534 U.S. 407, 412 (2002).  Petitioner contends that the sentence inserted in the

23  instruction given:

24  'Diagnosed mental disorder' includes a congenital or a prior
    condition affecting the emotional or volitional capacity that
25  predisposes a person to commission of criminal sexual acts in a
    degree constituting the person a menace to the health and safety of
26  others[]

40

1   (respondent's answer at 22, n.6), does not equate to "proof of serious difficulty in controlling

2   behavior," and thus is unconstitutional under Crane, 534 U.S. at 412.

3         Respondent contends that the state court's reasoning was correct and that because

4   CALJIC No. 4.19 mirrors the definition of "diagnosed mental disorder" set forth in § 6600,

5   subdivision (c), the jury finding that petitioner qualifies as an SVP as defined by the SVPA

6   necessarily establishes petitioner has serious difficulty in controlling his behavior.  (Traverse at

7   22-23.)  Respondent points out that the California Supreme Court subsequently found CALJIC

8   No. 4.19 to be constitutionally adequate.  People v. Williams, 31 Cal.4th 757, 792 (2003), cert.

9   denied, Williams v. California, 540 U.S. 1189 (U.S.Cal. Feb 23, 2004).

10        The state court found this claim had no merit:

11      We find the trial court had no duty to give the requested instruction
      because the standard instruction was adequate.

12

13      While the trial court must instruct on the general principles of law
      relevant to the issues raised by the evidence (*People v. St. Martin*

14      (1970) 1 Cal.3d 524, 531; *People v. Breverman* (1998) 19 Cal.4th
      142, 154), "[a] defendant is not entitled to have the jury instructed
      in any particular terms if the instruction given adequately conveys

15      the correct rule of law."  (*People v. Cox* (1991) 53 Cal.3d 618, 674.)

16      [Petitioner] requested the court to instruct the jury that he "is
      currently suffering from a mental condition that renders him

17      dangerous beyond his control."[10]  The court denied the request,
      finding CALJIC No. 4.19, the standard jury instruction, adequate

18      because it tracked the statutory language and thereafter instructed
      the jury in the language of CALJIC No. 4.19.

19

20      As given by the court, CALJIC No. 4.19 states in pertinent part:

21          The term 'sexually violent predator' means a person
      who, one, has been convicted of a sexually violent

22          offense against two or more victims for which he or
      she received a sentence; and two, has a diagnosed

23          mental disorder . . . that makes him a danger to the
      health and safety to others in that it is likely that he
      will engage in sexually violent predatory criminal

24

25      [10]  The full instruction requested by [petitioner] reads:  "In order to find that respondent is
      a Sexually Violent Predator petitioner must establish beyond a reasonable doubt that respondent

26  is currently suffering from a mental condition that renders him dangerous beyond his control."

behavior [¶ . . . ¶]  'Diagnosed mental disorder' includes a congenital or a prior condition affecting the emotional or volitional capacity that predisposes a person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others. . . .  (CALJIC No. 4.19 (1998) rev.).)

We conclude that CALJIC No. 4.19 tracks the language of the SVPA and a finding that a defendant qualifies as an SVP as defined by the SVPA necessarily establishes the defendant has serious difficulty in controlling his behavior as required by *Kansas v. Crane* (2002) 534 U.S. 407 [151 L.Ed.2d 856] and *Hendricks*, *supra*, 521 U.S. 346 [138 L.Ed.2d 501].

In *Hendricks*, *supra*, the Supreme Court upheld the constitutionality of Kansas's SVPA against a substantive due process challenge.  The language of that statute defined an SVP as "'any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence.'"  "A 'mental abnormality' was defined, in turn, as a 'congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others.'" (*Id.* at p. 352 [138 L.Ed.2d at p. 509].)  The Kansas Supreme Court invalidated the act because in its view, the prerequisite "mental abnormality" did not satisfy the substantive due process requirement that involuntary civil commitment be predicated on a finding of "mental illness."

The United States Supreme Court rejected this view, reasoning that the act "requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior.  [Citation.]  The precommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness."  (521 U.S. at p. 358 [138 L.Ed. 2d at p. 513], italics added.)

Thus, in upholding the Kansas act, the Supreme Court in Hendricks found the statutory language defining a mental abnormality and requiring that the abnormality make the offender "likely to engage in the predatory acts of sexual violence," sets forth adequate criteria to establish that the offender is unable to control his dangerousness to a degree sufficient to meet due process requirements. (*Hendricks*, *supra*, 521 U.S. at p. 360 [138 L.Ed.2d at p. 514].)

1
2
3
4
5
6
7
8
9
10
11
12
13
14

> The high court revisited the Kansas SVPA in *Kansas v. Crane*, *supra*, 534 U.S. 407 [151 L.Ed.2d 856], and made clear that a standard of total inability to control one's behavior is not a constitutional prerequisite to an SVP commitment.  The court explained that "[i]nsistence upon absolute lack of control would risk barring the civil commitment of highly dangerous persons suffering severe mental abnormalities." (*Id.* at pp. 411-412 [115 L.Ed. at p. 862].)  The court clarified that it did not give to the phrase "'lack of control' a particularly narrow or technical meaning . . . [and recognized that] in cases where lack of control is at issue, 'inability to control behavior' will not be demonstrable with mathematical precision.  It is enough to say that there must be proof of *serious difficulty in controlling behavior*." (*Id.* at p. 413 [151 L.Ed.2d at p. 862], italics added.)
>
> The statutory language in the SVPA is similar to the language used in the Kansas act upheld in *Hendricks* and *Crane*. (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1154.)  Like the Kansas statute, California's SVPA requires the jury to find that the offender has a "diagnosed mental disorder" that affects his "emotional or volitional capacity," which "predisposes" him to the commission of criminal sexual acts and makes it "likely that he will engage in sexually violent predatory criminal behavior."  Under *Crane* these criteria are sufficient to establish the offender has a current mental condition that causes him serious difficulty in controlling his behavior. (*Crane, supra*, 534 U.S. at p. 413 [151 L.Ed.2d 862; see also *People v. Buffington, supra*, 74 Cal.App.4th at p. 1157.)

15
16
17

> Accordingly, because CALJIC No. 4.19 correctly tracks the language of the SVPA, the trial court had no duty to give another instruction. . . . [T]herefore, . . . [the petitioner's] claim of error [is rejected].

18  (Opinion, at 11-15.)

19          In Crane, the United States Supreme Court held that the Kansas SVPA did not

20  require the state to prove the offender's total or complete lack of control over his dangerous

21  behavior, but that the federal constitution does not allow civil commitment under the Act without

22  any lack of control determination.  The court found there must be proof of serious difficulty in

23  controlling behavior.  This does not mean the state must prove the defendant has a total inability

24  to control.

25          The Ninth Circuit has confirmed that Crane spoke to the outer limits of an

26  offender's conduct.  Brock v. Seling, 390 F.3d 1088, 1091 (9th Cir. 2004).  The Brock court found

1  that Crane does not require "total or complete" lack of control, but only "some" showing of an

2  abnormality that makes it "difficult, if not impossible for the dangerous person to control his

3  dangerous behavior." Id. at 411 (citing Hendricks, 521 U.S. at 358.)  In Brock,

4        [d]uring commitment proceedings, the jury made definite findings
         regarding control on the basis of extensive expert testimony. While

5        the jury did not specify the severity of Brock's condition, it is clear
         it did not commit him absent "any" showing of control in

6        contravention of Crane.

7  Brock, 390 F.3d at 1091 (citations omitted).  The Brock court found that "the United States

8  Supreme Court does not require a fact finder to make specific determinations of "lack of control"

9  or "volitional impairment" before ordering civil commitment." Id. at 1091.

10       Moreover, the Supreme Court has clearly established that, in civil commitment

11  proceedings, "due process requires the state to justify confinement by proof more substantial than

12  a mere preponderance of the evidence." Addington v. Texas, 441 U.S. 418, 427 (1979).  The

13  Court did not mandate the use of the "clear and convincing" standard, but found that standard

14  constitutionally adequate. Id. at 433.  California law provides for a "beyond a reasonable doubt"

15  standard, which satisfies the federal constitutional requirement.

16       In addition, California's SVPA is similar to Kansas's statutory scheme upheld by

17  the Supreme Court in Hendricks.  Accord Seling v. Young, 531 U.S. 250, 260 (2001) (construing

18  and upholding as a civil rather than punitive process Washington's sexually violent predator

19  statutory scheme because the Washington Act is similar to the Kansas Act upheld in Hendricks );

20  Munoz v. Kolender, 208 F.Supp.2d 1125, 1134-35 (S.D.Cal.2002) (noting that California's

21  SVPA procedures and confinement are civil in nature rather than criminal and punitive because,

22  among other reasons, California's statutory scheme is similar to Kansas's and Washington's).

23       In the present case, Dr. Putnam testified that in terms of volitional capacity,

24  petitioner's actions in the 1996 offense qualified under the statute.  (RT (Sept 2001) at 240; 243.)

25  Although Dr. Donaldson testified that he found petitioner did not suffer from volitional

26  /////

1 | impairment (RT (Sept 2001) at 776-77), Dr. Updegrove testified that petitioner met the standard
2 | for SVP commitment.  (RT (Sept 2001) at 310-455.)

3 |       The jury was instructed that the state had the burden of proving beyond a
4 | reasonable doubt that petitioner was a sexually violent predator.  (RT (Sept 2001) at 965.)  The
5 | jury was also instructed that they could not find petitioner to be a sexually violent offender based
6 | on prior offenses without relevant evidence of a currently diagnosed mental disorder that made
7 | him a danger to the health and safety of others in that it was likely he would engage in sexually
8 | violent predatory criminal behavior.  (Id.)

9 |       The jury found that petitioner had been convicted of sexually violent offenses
10 | against two different victims.  (RT (Sept 2001) at 1131.)  The jury found that petitioner had a
11 | diagnosed mental disorder that makes him a danger to himself and others.  (Id.)  The jury further
12 | found that petitioner was likely to engage in sexually violent predatory criminal behavior as a
13 | result of the diagnosed mental disorder.  (Id. at 1132.)

14 |       Because the United States Supreme Court does not require a fact finder to make
15 | specific determinations of "lack of control" or "volitional impairment" before ordering civil
16 | commitment of a sexually violent predator, this claim should also be denied.

17 |       For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that
18 | petitioner's application for a writ of habeas corpus be denied.

19 |       These findings and recommendations are submitted to the United States District
20 | Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty
21 | days after being served with these findings and recommendations, any party may file written
22 | objections with the court and serve a copy on all parties.  Such a document should be captioned
23 | "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
24 | shall be served and filed within ten days after service of the objections.  The parties are advised
25 | /////
26 | /////

1 that failure to file objections within the specified time may waive the right to appeal the District

2 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3 DATED:  July 21, 2005.

UNITED STATES MAGISTRATE JUDGE

/001; rose1502.157a